Eric H. Gibbs (SBN 178658)
Andre M. Mura (SBN 298541)
Amanda M. Karl (SBN 301088)
Aaron Blumenthal (SBN 310605)
**GIBBS LAW GROUP LLP**
505 14th Street, Suite 1110
Oakland, California 94612
Telephone:   (510) 350-9700
Fax:  (510) 350-9701
ehg@classlawgroup.com
amm@classlawgroup.com
amk@classlawgroup.com
ab@classlawgroup.com

Michael S. Danko (SBN 111359)
Kristine K. Meredith (SBN 158243)
**DANKO MEREDITH**
333 Twin Dolphin Drive, Suite 145
Redwood Shores, CA 94065
Telephone: (650) 453-3600
Facsimile: (650) 394-8672
mdanko@dankolaw.com
kmeredith@dankolaw.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID STERLING, on behalf of himself and all those similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>INTEL CORP.,<br><br>Defendant. | Case No:<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

**INTRODUCTION**

1.      For over two decades, Intel has been highly successful in loading most of the world's computers with its processors. Unfortunately, Intel designed its processors to prioritize speed, not security. Until 2018, Intel didn't even have a hardware security team.

2.      As a result, Intel's hardware design contains serious security flaws. On January 3, 2018, the news broke that security researchers had discovered two methods that could be used to exploit flaws in Intel's hardware design. These two methods can give a hacker access to anything on the computer. And because they exploit flaws in hardware, not software, they work on any operating system, so long as it runs on an Intel processor.

3.      With no hardware fix possible, software makers have recently attempted to create patches to protect Intel-based computers from hackers. But these software patches significantly slow down the computers on which they're installed and don't provide complete protection.

4.      Consumers and businesses that purchased Intel-based computers now face an increased risk of being hacked, even after installing software patches that may substantially slow down their computers, giving them performance far below what they paid for.

5.      Intel should not be permitted to retain the profits it made from skimping on security all these years.

**PARTIES**

6.      Plaintiff David Sterling purchased a Dell server that contained an Intel processor on April 25, 2013.  He is a resident and citizen of North Carolina.

7.      Defendant, Intel Corp., is a Delaware corporation with its headquarters and principal place of business in Santa Clara, California.

**JURISDICTION AND VENUE**

8.      This Court has jurisdiction pursuant to 28 U.S.C. § 1332(d) because this is a class action on behalf of more than one hundred putative Class members for damages that exceed $5,000,000.00, exclusive of interest and costs.

9.      Defendant is subject to personal jurisdiction in this Court because Defendant is headquartered here, and because Defendant engages in substantial, continuous, systematic, and non-

CLASS ACTION COMPLAINT

isolated business activity within the state of California.

10.     Venue is proper within this District because a substantial part of the events giving rise to the claims occurred in this District, where Intel is headquartered.

## INTRADISTRICT ASSIGNMENT

11.     Assignment is proper to the San Jose division of this District under Local Rule 3-2(c)-(e), as a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in Santa Clara County, where Intel is headquartered.

## FACTUAL ALLEGATIONS

### A.     What Is a Processor?

12.     Often referred to as the "brains" of the computer, the central processing unit (CPU) performs the basic calculations that underlie most modern programming languages. These calculations include both mathematical calculations (e.g., 56 x 94) and logic calculations (e.g., if A then B, otherwise C).

13.     CPUs are made up of various components, and designing a CPU means deciding the best way to put these components together. Like buildings, CPUs have an overall "architecture" that is affected by the design choices of their makers. And different models of CPUs can have vastly different architectures.

14.     The architecture of the CPU affects its functionality, including how fast it is and how secure it is from hackers.

### B.     Intel Focuses on Speed, Not Security

15.     When designing the architecture of its processors, Intel has for years focused on speed, while putting little (if any) focus on security.

16.     For example, when speaking at a conference in 2015, Intel's CEO made a list of Intel's priorities and placed "security" last on the list.[1] Only in 2018, after the discovery of two major security vulnerabilities in Intel CPUs, did Intel create a "hardware security" team.[2]

---

[1] Marlene Den Bleyker, *Intel and Oracle make state-of-the-art data centers the new normal*, SILICON ANGLE (Oct. 26, 2015), http://bit.ly/2FeJOUr.
[2] Tom Krazit, Report: *Intel creates new group to focus on hardware security amid Meltdown and Spectre fallout*, GEEKWIRE (Jan. 8, 2018), http://bit.ly/2may9yp.

17.     While software makers have spent billions of dollars "on software security over the last 20 years," unfortunately, "hardware security has not received the same focus."[3]

18.     Because hardware forms the foundation of the computer, the software built on top of it is only as secure as the hardware itself.

### C.     Security Researchers Figure Out How to Exploit Two Major Security Vulnerabilities in Intel's CPU Architecture

19.     On January 3, 2018, news broke that four independent teams of security researchers had uncovered two major security exploits affecting nearly every Intel CPU manufactured since 1995. The security researchers gave these exploits the nicknames "Meltdown" and "Spectre."

#### 1.     The Meltdown Vulnerability

20.     The "Meltdown" security vulnerability exists on "Intel processors because of the aggressive way they handle" a process called "speculative execution."[4] Speculative execution occurs when the CPU runs too far ahead of the rest of the computer and is waiting for it to catch up. For example, if the CPU reaches a fork in the code, such as "If A, do B, otherwise do C," and doesn't know whether "A" is true, it will make an educated guess, and continue processing. If "A" turns out to be true, the CPU uses all the calculations it has already done to make the computer run faster. If not, the CPU discards all the subsequent instructions it executed.

21.     The key to the Meltdown exploit, according to Daniel Gruss, one of the researchers who discovered it, is that the Intel CPU "basically runs too far ahead, executing instructions that it should not execute."[5] *Wired* explains that "when Intel processors perform … speculative execution, they don't fully segregate processes that are meant to be low-privilege and untrusted from the highest-privilege memory."[6] As a result, "a hacker can trick the processor into allowing unprivileged code to peek into the [privileged]  memory."[7] From privileged memory, a hacker could retrieve passwords, bank account

---

[3] *Id.*

[4] Brad Chacos and Michael Simon, *Meltdown and Spectre FAQ: How the critical CPU flaws affect PCs and Macs*, PCWORLD (Jan. 12, 2018), http://bit.ly/2CjM7Vu.

[5] Andy Greenberg, *A Critical Intel Flaw Breaks Security For Most Computer*, Wired (Jan. 3, 2018), http://bit.ly/2CyQxLq.

[6] *Id.*

[7] *Id.*

information, or any other sensitive data.

22.     This hardware flaw makes all software built on top of it vulnerable. *Wired* explains, that "One of the most basic premises of computer security is isolation: If you run somebody else's sketchy code as an untrusted process on your machine, you should restrict it to its own tightly sealed playpen. Otherwise, it might peer into other processes, or snoop around the computer as a whole. So when a security flaw in computers' most deep-seated hardware puts a crack in those walls, … it breaks some of the most fundamental protections" built into computer software.[8] As a result, the Meltdown exploit will work on any operation system, so long as it is running on Intel hardware.[9]

23.     According to the security researchers who discovered it, the Meltdown exploit works on "every Intel processor" made "since 1995," except for "Intel Itanium" and pre-2013 "Intel Atom" processors.[10]

### 2.     The Spectre Vulnerability

24.     Discovered alongside Meltdown, Spectre is another security vulnerability affecting all Intel CPUs.

25.     Spectre exploits speculative execution to trick the processor into running the hacker's code. During speculative execution, the CPU will use the computer's past behavior to predict which branch of code (e.g., "if A, then B, otherwise C") is more likely to be correct. By repeatedly executing the same lines of code (e.g., "A," "A," "A," "A"), a hacker can train the processor to make the prediction the hacker wants.

26.     All Intel CPUs are exploitable by Spectre.

### D.     Intel's Security Failures

27.     According to the creator of the Linux operating system, Linus Torvalds, "A competent CPU engineer would" have made "sure speculation doesn't happen across protection domains."[11] Unfortunately, Intel did not do so. Torvalds continues, "I think somebody inside of Intel needs to really

---

[8] *Id.*
[9] Moritz Lipp et al., *Meltdown*, https://meltdownattack.com/meltdown.pdf (last accessed Jan. 15, 2018).
[10] Graz University of Technology, *Meltdown and Spectre*, https://spectreattack.com/ (last accessed Jan. 15, 2018).
[11] Linus Torvalds, *Avoid speculative indirect calls in kernel*, LKML.org (Jan. 3, 2018), http://bit.ly/2DFceKx.

take a long hard look at their CPU" design.[12] Torvalds recommends that developers "should start looking towards" switching to CPUs from one of Intel's rivals, "ARM."[13] *Reuters* reports that many of Intel's "data center customers … are exploring using microchips from the market leader's rivals," such as ARM and AMD, when building "new infrastructure after the discovery of security flaws."[14]

28.    The flaws in Intel CPUs speak not only to the company's inattention to security, but also to its company culture. Talking at a conference, an Intel vice president described the company's decision-making philosophy as: "Iterate quickly, fail fast, and move on. You don't need to be perfect."[15]

29.    Paul Kocher told *Scientific American* that he discovered these vulnerabilities by thinking about CPU design decisions that were made "where security was not the top priority."[16] But, Kocher says, Intel was "in a much better position than external researchers to find these vulnerabilities, since they know in intimate detail how all of the technology works—whereas I was poking around without any inside knowledge."[17] Further, he has told *Wired*, "The shocker for me is that these attacks weren't discovered long ago."[18]

30.    *The Guardian* says that these vulnerabilities were built into Intel CPUs because "[p]rocessors were optimised for performance, without basic questions being asked about whether their design was secure."[19]

**E.    There Have Been No Hardware Fixes**

---

[12] *Id*.
[13] *Id*.
[14] Reuters, *Cloud Providers Are Already Considering Intel Rivals After Meltdown, Spectre Chip Flaw Discoveries* (Jan. 10, 2018), http://for.tn/2mhF7RU.
[15] Kylie Anderson, *Intel pivots from product to solutions company to empower digital transformation*, SILICON ANGLE (Nov. 30, 2017), http://bit.ly/2D7rbBA.
[16] Larry Greenemeier, *Meltdown and Spectre Expose the Dark Side of Superfast Computers*, SCIENTIFIC AMERICAN (Jan. 9, 2018), http://bit.ly/2n88uHS.
[17] *Id*.
[18] Andy Greenberg, *Triple Meltdown: How So Many Researchers Found a 20-Year-Old Chip Flaw at the Same Time*, WIRED (Jan. 7, 2018), https://www.wired.com/story/meltdown-spectre-bug-collision-intel-chip-flaw-discovery/.
[19] *The Guardian view on hardware bugs: more security, less speed*, THE GUARDIAN (Jan. 4, 2018), https://www.theguardian.com/commentisfree/2018/jan/04/the-guardian-view-on-hardware-bugs-more-security-less-speed.

31.     Because Meltdown and Spectre exploit vulnerabilities in CPU architecture, these exploits can't be properly fixed in hardware until Intel redesigns its processors. But that doesn't help people who currently have an Intel processor. In the meantime, to mitigate the threat from Meltdown and Spectre, operating system makers released patches to make the vulnerabilities harder to exploit.

### 1.     The Meltdown Patches

32.     Linux developers released a patch for the Meltdown vulnerability on November 10, 2017. Apple released its own Meltdown patch, for its computers and phones, on December 6, 2017.

33.     Microsoft was forced to rush out a patch on January 3, 2018, when the existence of the Meltdown exploit was publicly leaked. At the time, Microsoft was still beta testing its Meltdown patch, but it had to do an emergency release when the news broke because the public announcement of a vulnerability helps hackers to start exploiting it. The Equifax hack, for example, was facilitated by the public announcement of a vulnerability, coupled with Equifax's failure to patch it.

34.     Microsoft, however, stressed that the patches would not be perfect because "[a]ddressing a hardware flaw using a software update presents significant challenges."

### 2.     The Spectre Patches

35.     According to public reports, "there are no universal Spectre patches."[20]

36.     Microsoft introduced a few changes to its Windows operating systems on January 3, 2018 to make it harder for a hacker to exploit Spectre.[21] On January 8, 2018, Apple did the same for iOS 11.2.2.

37.     But "[t]he depth of the problem and impact make quick fixes almost impossible," said Atiq Raza, CEO at Virsec Systems. "Until 20 years of processors are replaced, the operating system vendors will not be able to close this gap."[22]

### F.     Installing the Software Patches for Meltdown and Spectre Slows Down Computers and Servers

---

[20] Steven J. Vaughan-Nichols, *The Linux vs Meltdown and Spectre battle continues*, ZDNET (Jan. 8, 2018), http://zd.net/2DF2ygA.

[21] Microsoft, *Understanding the performance impact of Spectre and Meltdown mitigations on Windows Systems* (Jan. 9, 2018), http://bit.ly/2CVogik.

[22] Maria Korolov, *Spectre, Meltdown Hit On-Prem Windows Servers Hardest*, DATACENTER KNOWLEDGE (Jan. 23, 2018), http://bit.ly/2DGOF3T.

38.     The patches released thus far are slowing down computers and servers on which they're installed—often substantially.

39.     For example, according to Intel's benchmarking, applying the patch to Windows 10 on a computer with an Intel Core i7 processor, released in mid-2015, will cause a 21 percent drop in "responsiveness."[23] Responsiveness affects how long a computer takes to launch an application, open a file, edit a photo, or install an application in the background.[24]

40.     According to Microsoft, Windows 10 machines with Intel processors from 2015 and older will experience "significant slowdowns."[25] And machines with older operating systems (e.g., Windows 7 and 8) that run on Intel processors from 2015 or older will experience substantial slowdowns that "most users" will notice.[26]

41.     Microsoft also warned that any server running on Microsoft's Windows Server operating system will see a "significant performance impact," especially if the server is performing input-output (I/O) intensive tasks.[27] *The Verge* reports that Microsoft is warning many IT administrators not to implement the Meltdown and Spectre patches due to these performance issues.[28] Jeff Ready, CEO of Scale Computing, said that virtual file servers, such as cloud storage systems, will suffer a "significant negative performance impact" from the patches for Meltdown and Spectre.[29]

42.     RedHat, which makes an enterprise version of Linux, said that various database workloads would see an 8 to 19 percent performance reduction after applying the Linux patches for Meltdown and Spectre.[30]

43.     *Forbes* reports that video-game maker "Epic Games gives us one of the best illustrations

---

[23] Devin Coldewey, *Intel details performance hit for Meltdown fix on affected processors*, TECHCRUNCH (Jan. 11, 2018), http://tcrn.ch/2DBGcMM.
[24] *Id.*
[25] Tom Warren, *Microsoft reveals how Spectre updates can slow your PC down*, THE VERGE (Jan. 9, 2018), http://bit.ly/2mjYjiL.
[26] *Id.*
[27] *Id.*
[28] *Id.*
[29] Chris Mellor, *Spectre and Meltdown fixes: How will they affect storage?*, THE REGISTER (Jan. 8, 2018), http://bit.ly/2CTqfUa.
[30] RedHat, *Speculative Execution Exploit Performance Impacts - Describing the performance impacts to security patches for CVE-2017-5754 CVE-2017-5753 and CVE-2017-5715* (Jan. 4, 2018), http://red.ht/2AGQacx.

of the havoc the patches are wreaking on the cloud."[31] Epic Games "recently detailed patch-related performance declines in the popular battle royale game Fortnite. 'All of our cloud services are affected by updates required to mitigate the Meltdown vulnerability,' Epic Games wrote last week. 'We heavily rely on cloud services to run our back-end and we may experience further service issues due to ongoing updates.' Fortnite players have experienced problems with log-ins, slowdowns, and downtime—not ideal for a competitive gaming environment. The problems have persisted since Fortnite initially outlined them last week. The company [says] that it is still working with its cloud providers on a total resolution."[32]

44.    Mobile services company Branch Metrics reported "slowdowns and errors with its Amazon Web Services [AWS] cloud servers" once Amazon implemented the Meltdown and Spectre patches.[33] Branch's engineering team kept the company's services "operational by reworking some of their architecture, and purchasing more server capacity from AWS to stabilize the workloads."[34]

45.    People who use Lustre, a "parallel distributed filesystem," reported "slowdowns ranging from 10 per cent as high as 45 per cent for certain [input-output] intensive applications."[35]

46.    "Francis Wolinski, a data scientist with Paris-based Blueprint Strategy, noted that Python slowed significantly (about 37 per cent) after applying the Meltdown patch for Windows 7."[36] Python is a programming language that many businesses use to run their backend servers and databases.

47.    Intel has also released a "firmware" (or software) patch for many of its server and database CPUs, which "has reduced workload speeds by up to 25 per cent."[37]

---

[31] Brooke Crothers, *Spectre, Meltdown: First Real Signs Of The Hit On Windows 10, Intel Performance Trickle In*, FORBES (Jan. 14, 2018), http://bit.ly/2raFCTR.
[32] Lily Hay Newman, *The Hidden Toll of Fixing Meltdown and Spectre*, WIRED (Jan. 12, 2018), http://bit.ly/2CWoVNn.
[33] *Id.*
[34] *Id.*
[35] Thomas Claburn, *Meltdown, Spectre bug patch slowdown gets real – and what you can do about it*, THE REGISTER (Jan. 9, 2018), http://bit.ly/2CLU1Hu.
[36] *Id.*
[37] Chris Merriman, *Spectre and Meltdown patches are slowing down newer Intel chips too*, THE INQUIRER (Jan. 18, 2018), http://bit.ly/2mMrSci.

### G.       Slowdowns on Computers and Servers Take a Substantial Financial Toll

48.       Both consumers and businesses feel the pain when their computer processors struggle to effectively run the current version of applications and other software. When their processor's performance is insufficient, consumers and businesses are forced to upgrade.

49.       Consumers and businesses might decide, for the time being, not to apply the Meltdown and Spectre patches. But in the longer term, they have no real option.

50.       Individuals and businesses that don't apply the Meltdown and Spectre patches face the risk of being hacked. In particular, the Meltdown vulnerability is an "immediate threat, with proof-of-concept exploits already available" to hackers on the internet.[38] Consumers and businesses may have already received the patch without realizing because they have automatic updates enabled.

51.       Consumers pay more for a smooth computing experience. A chief analyst at Gartner Research says that U.S. computer purchasers "look for quality and functionality rather than looking for the lowest price."[39]

52.       When buying a computer, purchasers consider not only how fast the computer will run at the time of purchase, but also how fast it will run in the future. Over time, operating systems and other software become more complex and demanding on the CPU. When the computer can no longer run modern software at a reasonable speed, it's time to upgrade.

53.       Consumers can wait longer between upgrades if they buy a computer with a better processor. The "upgrade cycle" refers to how long it takes before the average consumer has to replace his or her computer. Due to improvements in overall processor speed, the upgrade cycle for computers has become much longer. Today, people only purchase a new computer, on average, every 6 years.[40] In 2016, *PCWorld* wrote that "upgrades have slowed because current operating systems can run well on older Intel-based [computers]."[41]

54.       With the Meltdown and Spectre patches, that's changed. As these patches slow down

---

[38] PonteGeek, *Intel, under the spotlight* (Jan. 5, 2018), http://bit.ly/2rl7dlg.
[39] Jake Smith, *IDC: Q4 PC shipments rise for first time in six years*, ZDNET (Jan. 11, 2018), http://zd.net/2rf2bqw.
[40] Agam Shah, *The PC upgrade cycle slows to every five to six years, Intel's CEO says*, PCWORLD (June 1, 2016), http://bit.ly/2DtQ2CY.
[41] *Id.*

Intel-based computers, consumers will be forced to upgrade more often.

55.     That becomes expensive quickly. On average, in 2015, a consumer spent $544 to purchase a desktop computer.[42] Laptops are typically much more expensive for the same performance as a desktop. These expenses are substantial when a consumer has to switch from, for example, a six-year upgrade cycle to a two-year upgrade cycle. They have to buy a brand-new computer three times as often.

56.     Due to the slowdowns, consumers also paid a price premium for a speed they will no longer be getting. For example, *Zynath Investment* points out that the price premium that customers paid for Intel chips is no longer justified "due to the fact that the very feature that was making them faster than the competition is the key to the [Meltdown] vulnerability."[43] After the "performance penalty to all Intel-based CPUs" due to the patches, customers will no longer get the level of performance they paid for.[44]

### 3.     Businesses Feel the Financial Impact of Slowdowns

57.     Businesses face some of the largest performance impacts from the Meltdown and Spectre patch. *Computer Weekly* reports that multi-user systems, such as virtual or cloud servers, and "applications that rely heavily on kernel-level system calls, such as databases, will be most affected" by the Meltdown and Spectre patches.[45] "Ned Bellavance, director of cloud solutions at Anexinet, said that there have been reports of performance degradation by as much as 30 percent."[46]

58.     Some businesses have already been forced to buy additional server capacity due to slowdowns from the patches. And data centers can expect a "cost increase, since they might need to purchase additional hardware to handle the same workload."[47]

59.     Like consumers, businesses will have to switch to a more frequent upgrade cycle if their

---

[42] Statista, *Average selling price of desktop personal computers (PCs) worldwide from 2005 to 2015 (in U.S. dollars)*, http://bit.ly/2DvhU9S.

[43] Zynath Investment, *Intel – Meltdown & Spectre Vulnerabilities Explained*, SEEKING ALPHA (Jan. 5, 2018), http://bit.ly/2rcLPia.

[44] *Id.*

[45] Warwick Ashford, *Meltdown and Spectre a big deal for enterprises*, COMPUTER WEEKLY (Jan. 9, 2018), http://bit.ly/2Dn1gK6.

[46] Korolov, *supra* note 22.

[47] *Id.*

CLASS ACTION COMPLAINT

computers and servers are running slower. Businesses that choose not to upgrade a machine face a loss in productivity of between $5,077 and $13,103 per employee per year because worker productivity declines as computers slow.[48]

60.     Processing power is a resource that has quantifiable value and is packaged and sold by cloud service providers, such as Amazon Web Services. *The Next Platform* estimates that "the amount of computing value lost to the slowdown [from the patches] amounts to $6 billion annually."

**H.     Intel's Firmware Patch Causes Other Issues, In Addition to Slowdown**

61.     To help reduce the risk of Meltdown and Spectre, Intel has released updates to the "firmware" for most of its processors.[49]

62.     But Intel's firmware patch is causing software incompatibility issues and hardware crashes. Many businesses are reporting that their servers are crashing when they install Intel's firmware patch.[50]

63.     An unplanned server crash can be a serious problem for businesses. For example, a supply chain management company will lose $11,000 for every *minute* that its system is down.[51] IBM Global Services estimated in 2008 that businesses' average revenue loss of an unplanned application outage was $2.8 million per hour.[52]

64.     Businesses cannot afford to have patches crashing their systems, or breaking the compatibility of their applications.

**I.     Plaintiff's Experience**

65.     Plaintiff Sterling purchased a Dell server online on April 25, 2013 from his home in North Carolina, which is used for business computing.  That server contains an affected Intel processor.

66.     Until January 2018, Mr. Sterling was unaware that his server's processor contained major security vulnerabilities.  He has had difficulty determining whether a patch is available.  Any

---

[48] J. Gold Associates, *Replacing Enterprise PCs: The Fallacy of the 3-4 Year Upgrade Cycle* (Aug. 2014), at *6, http://bit.ly/2FPp3Qu.

[49] Jonathan Crowe, *A Clear Guide to Meltdown and Spectre Patches*, BARKLY (Jan. 18, 2018), http://bit.ly/2rgiymI.

[50] Merriman, *supra* note 37.

[51] Martin Perlin*, Costs and Scope of Unplanned Outages*, EVOLVEN (Nov. 17, 2010), http://bit.ly/2Bd2z8r.

[52] *Id.*

patch that would substantially affect the performance of his server, however, would negatively affect his business. But if a patch is not installed, then Mr. Sterling faces software and hardware issues including security vulnerabilities, which could also affect his business. When he purchased the server with the Intel processor, Mr. Sterling was not aware, and it was not disclosed to him, that he would ultimately have to choose between performance and basic security, or that he would have to buy a new server at substantial cost as a replacement so soon in the life of his existing server.

## **TOLLING**

67. *Discovery Rule Tolling*. Plaintiff and members of the Class could not have reasonably discovered through the exercise of reasonable diligence that their Intel processors suffered from major security vulnerabilities that, if mitigated, resulted in reduced processing performance, within the time period of any applicable statute of limitations. Plaintiff and members of the Class did not discover and did not know of any facts that would have caused a reasonable person to suspect that Defendant was concealing a latent defect and/or that the Intel processors contained a defect that exposed them to security vulnerabilities that, if mitigated, resulted in reduced computer performance.

68. *Fraudulent Concealment Tolling*. Throughout the time period relevant to this action, Defendant concealed from and failed to disclose to Plaintiff and members of the Class vital information concerning the defect described herein, despite the fact that Defendant knew, or should have known of, the defect in its processors well before its discovery by a third party. Defendant kept Plaintiff and members of the Class ignorant of vital information essential to the pursuit of their claims. As a result, neither Plaintiff nor members of the Class could have discovered the defect, even upon reasonable exercise of diligence. Despite its knowledge of the defect, Defendant failed to disclose and concealed, and continues to conceal, critical information relating to the defect from Plaintiff and members of the Class, even though, at any point in time, it could have done so through individual correspondence, media release, or by other means. Plaintiff and members of the Class justifiably relied on Defendant to disclose the defect in the Intel processors they purchased or leased (either directly or as a component of, among other things, a computer or server), because the defect was hidden and not discoverable through reasonable efforts by Plaintiff and members of the Class. Thus, the running of all applicable statutes of limitations have been suspended with respect to any claims that Plaintiff and members of the Class

have sustained as a result of the defective Intel processors by virtue of the fraudulent concealment doctrine.

69. *Estoppel*. Defendant was under a continuous duty to disclose to Plaintiff and members of the Class the true character, quality, and nature of the defective processors and associated security vulnerabilities and reductions in processing performance, but concealed the true nature, quality, and character of the processors. Based on the foregoing, Defendant is estopped from relying on any statutes of limitations in defense of this action.

## CLASS ACTION ALLEGATIONS

70. Plaintiff seeks certification of a Class defined to include:

> Nationwide Class: All persons or entities in the United States that purchased or leased one or more Intel processors, or one or more devices containing an Intel processor.

> North Carolina Subclass: All persons or entities in North Carolina that purchased or leased one or more Intel processors, or one or more devices containing an Intel processor.

> Implied Warranty Subclass: All persons or entities in the United States, but outside of Louisiana, that purchased or leased one or more Intel processors, or one or more devices containing an Intel processor.

71. Excluded from the Class are Intel and its employees, officers, directors, legal representatives, successors, and wholly or partly owned subsidiaries or affiliated companies; Class counsel and their employees; and the judicial officers and their immediate family members and associated court staff assigned to this case.

**A.    Numerosity**

72. There are millions of Class members in the United States.

**B.    Typicality**

73. Plaintiff's claims are typical of the claims of the Class.  Like members of the Class, Plaintiff purchased or leased an Intel device that is affected by the security vulnerabilities and patches discussed in this complaint.

### C.   Adequacy of Representation

74.     Plaintiff will fairly and adequately protect the Class' interests and has retained counsel competent and experienced in class-action litigation. Plaintiff's interests are coincident with, and not antagonistic to, absent Class members' interests because by proving their individual claims, they will necessarily prove the liability of Intel to the Class as well. Plaintiff is cognizant of, and determined to, faithfully discharge their fiduciary duties to the absent Class members as their representatives.

75.     Plaintiff's counsel has substantial experience in prosecuting class actions, including against Intel. Plaintiff and his counsel are committed to vigorously prosecuting this action, have the financial resources to do so, and do not have any interests adverse to the Class.

### D.   Commonality and Predominance

76.     There are numerous questions of law and fact the answers to which are common to each Class and predominate over questions affecting only individual members, including the following:

    a)  Whether Intel's design and sale of CPUs with undisclosed security vulnerabilities constitutes an unfair or deceptive act or practice under California and North Carolina law;

    b)  Whether Intel's deceptive and unlawful conduct led to its unjust enrichment such that Intel should be required to provide restitution to the Class; and

    c)  Whether Plaintiff and Class members are entitled to injunctive relief to halt Intel's unlawful conduct.

### E.   Superiority and Manageability

77.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all the individual Class members is impracticable. Likewise, because the damages suffered by each individual Class member are relatively small, the expense and burden of individual litigation would make it very difficult or impossible for individual Class members to redress the wrongs done to each of them individually, and the burden on the judicial system of individual actions would be enormous.

78.     The prosecution of separate actions by the individual Class members would also create a risk of inconsistent or varying adjudications.  The conduct of this action as a class action presents far

fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class member.

## COUNT I

### Unlawful, Unfair, and Fraudulent Business Practices

### Cal. Bus. & Prof. Code §§ 17200, *et seq.*

### (On Behalf of the Nationwide Class)

79.     Plaintiff incorporates by reference all allegations as if fully set forth herein.

80.     Intel violated and continues to violate California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.*, which prohibits unlawful, unfair, and fraudulent business acts or practices.

81.     Intel's acts and practices, as alleged in this complaint, constitute unlawful, unfair, and fraudulent business practices, in violation of the Unfair Competition Law.  In particular, Intel designed its CPUs even though they contained major security vulnerabilities that could only be fixed by patches that cause slower computer performance.  As described above, Intel knew or should have known had they performed adequate security testing that its CPUs contained these vulnerabilities.  Intel failed to disclose material facts concerning the CPU's vulnerabilities at the point of sale and otherwise.

82.     Intel's business acts and practices are unlawful in that they violate the California Consumer Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.*, for the reasons set forth in this complaint.

83.     Intel's acts and practices also constitute fraudulent practices in that they are likely to deceive a reasonable consumer.  As described above, Intel knowingly concealed material facts relating to the performance of its CPUs.  Had Intel not concealed these facts, Plaintiff, Class members, and reasonable consumers would not have purchased Intel CPUs or computers containing them, or would have paid significantly less for them.

84.     Intel's conduct also constitutes unfair business practices for at least the following reasons:

   a.   The gravity of harm to Plaintiff and the proposed Class from Intel's acts and practices far outweighs any legitimate utility of that conduct;

   b.   Intel's conduct is immoral, unethical, oppressive, unscrupulous, or substantially

injurious to Plaintiff and the members of the proposed Nationwide Class; and

    c.   Intel's conduct undermines and violates the stated policies underlying the Consumers Legal Remedies Act—to protect consumers against unfair and sharp business practices and to promote a basic level of honesty and reliability in the marketplace.

85.    As a direct and proximate result of Intel's business practices, Plaintiff and proposed Class members suffered injury in fact and lost money or property because they purchased and paid for products that they otherwise would not have, or in the alternative, would have paid less for. Plaintiff and the proposed Nationwide Class are entitled to an injunction and other equitable relief, including restitutionary disgorgement of all profits accruing the Intel, because of their unfair and deceptive practices, and such other orders as may be necessary to prevent the future use of these practices.

<u>**COUNT II**</u>

**Violation of California Consumers Legal Remedies Act**

**Cal. Civ. Code §§ 1750,** *et seq.*

**(On Behalf of the Nationwide Class)**

86.    Plaintiff incorporates by reference all allegations as if fully set forth herein.

87.    Intel is a "person" within the meaning of Civil Code §§ 1761(c) and 1770, and have produced "goods" within the meaning of Civil Code §§ 1761(b) and 1770.

88.    Plaintiff and members of the proposed Class are "consumers" within the meaning of Civil Code §§ 1761(d) and 1770, and have engaged in a "transaction" within the meaning of Civil Code §§ 1761(e) and 1770.

89.    Intel's acts and practices were intended to and did result in the sale of CPUs and computers containing its CPUs, and violate § 1770 of the Consumer Legal Remedies Act for at least the following reasons

    a.   Intel represented that its CPUs had characteristics, benefits, or qualities that they do not have;

    b.   Intel represented that its CPUs were of a particular standard or quality that they were not; and

     c.   Intel represented that its CPUs conferred or involved rights, remedies, and obligations which they do not.

90.    As described above, Intel designed CPUs with security vulnerabilities that software patches cannot fix without slowing the computers in which the CPUs are embedded.  Intel knew or should have known had they performed adequate security testing that its CPUs contained these vulnerabilities.  Intel failed to notify computer manufacturers that incorporated Intel's CPUs into its product, or consumers who purchased computers with Intel-designed CPUs, that these security vulnerabilities exist.

91.    Had Intel not concealed material facts about its CPUs, Plaintiff, members of the proposed Class, and reasonable consumers would not have purchased the CPUs or computers with its CPUs embedded, or would have paid less for them.

92.    Pursuant to the provisions of Cal. Civ. Code § 1782(a), Plaintiff will send a notice letter to Intel to provide them with the opportunity to correct its business practices.  If Intel does not thereafter correct is business practices, Plaintiff will amend (or seek leave to amend) the complaint to add claims for monetary relief, including restitution and actual damages under the Consumers Legal Remedies Act.

93.    Pursuant to California Civil Code § 1780, Plaintiff seeks injunctive relief, his reasonable attorneys' fees and costs, and any other relief that the Court deems proper, but not monetary relief at this time.

## COUNT III

### Violations of the North Carolina Unfair and Deceptive Trade Practices Act

### N.C. Gen. Stat. §§ 75-1.1, *et seq.*

### (On Behalf of the North Carolina Subclass)

94.    Plaintiff incorporates by reference all allegations as if fully set forth herein.

95.    Plaintiff and the North Carolina Subclass are persons under the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. §§ 75-1.1, *et seq.*

96.    Intel's acts and practices described above were performed in the course of Intel's trade or business and thus occurred in or affected "commerce," as defined in N.C. Gen. Stat. § 75-1.1(b).

97.     This Act makes unlawful "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce[.]"  The Act provides a private right of action for any person injured "by reason of any act or thing done by any other person, firm or corporation in violation of" the act.  N.C. Gen. Stat. § 75-16.

98.     In the course of Intel's business, Intel intentionally or negligently concealed and suppressed material facts concerning its CPUs' security vulnerabilities, including that fixing the vulnerabilities would slow the computer.  As described above, Intel knew or should have known had they performed adequate security testing that its CPUs contained these vulnerabilities.  These were inserted into computers and other devices that Plaintiff and Subclass members then purchased.  Plaintiff and North Carolina Subclass members did not and could not unravel Intel's omissions on their own.

99.     Intel thus violated the provisions of the Act by: (1) failing to disclose information concerning CPUs with the intent to induce customers to purchase them or devices using them; (2) representing that the CPUs are of a particular standard and quality when they are not, (3) representing that the CPUs have characteristics, benefits, and qualities which they do not have, and (4) otherwise engaging in conduct likely to deceive.

100.    Intel engaged in misleading, false, unfair or deceptive acts or practices that violated the Act by designing, manufacturing, and selling its CPUs while failing to disclose or actively concealing its security vulnerabilities.

101.    Intel intentionally and knowingly misrepresented material facts with intent to mislead Plaintiff and the North Carolina Subclass.

102.    Intel owed Plaintiff and the North Carolina Subclass a duty to disclose, truthfully, all the facts concerning the CPUs' security vulnerabilities and the slowing effects of the reparative patches because they:

      a.   Possessed exclusive knowledge that they were designing and selling CPUs containing major flaws that would render users unsafe;

      b.   Intentionally concealed the foregoing from Plaintiff and Subclass Members; and

      c.   Made incomplete or negligent representations about the CPUs while purposefully withholding material facts from Plaintiff that contradicted these representations.

103.   Intel's CPU's vulnerabilities were material to the Plaintiff and the North Carolina Class. A CPU, or a device containing a CPU, that does not expose its user to hackers who can access all files on the device, and whose fix does not slow the device's performance, is worth more than an otherwise comparable CPU or computer containing a CPU with those security vulnerabilities.

104.   Plaintiff and North Carolina Subclass members suffered ascertainable loss and actual damages as a direct and proximate result of Intel's concealment of and failure to disclose material information, including either results of its security testing or failure to perform security testing. Plaintiff and North Carolina Subclass members who purchased Intel's CPUs or devices containing the CPUs would not have purchased them at all, or would have paid less for them.

105.   Intel's violations present a continuing risk to Plaintiff as well as to the general public. Intel's unlawful acts and practices affect the public interest.

106.   As a result of Intel's wrongful conduct, Plaintiff and the North Carolina Subclass have been damaged in an amount to be proven at trial, and seek all just and proper remedies, including but not limited to treble damages, an order enjoining Intel's deceptive and unfair conduct, court costs, and reasonable attorneys' fees, and any other just and proper relief available under N.C. Gen. Stat. § 75-16.

## COUNT IV

### Breach of Implied Warranty

### (On Behalf of the Implied Warranty Subclass)

107.   Plaintiff incorporates by reference all allegations as if fully set forth herein.

108.   Plaintiff and members of the Class purchased or leased Intel CPUs, or devices containing Intel CPUs, from Intel, by and through Intel's authorized agents for retail sales, or were otherwise expected to be the eventual purchasers or lessors of Intel CPUs when purchased or leased from a third party.  At all relevant times, Intel was the designer, manufacturer, distributor, warrantor, and/or seller of the relevant processors.  Intel knew or had reason to know of the specific use for which its processors were purchased or leased.

109.   Intel is and at all relevant times was a "merchant" and seller of "goods" as defined under the Uniform Commercial Code.

110.   Intel CPUs are and were at all relevant times "good" within the meaning of the Uniform

Commercial Code.

111.    Pursuant to U.C.C. § 2-314, an implied warranty that goods are merchantable is implied in every contact for a sale of goods.  Intel impliedly warranted that its processors were in merchantable condition and fit for the ordinary purpose for which its processors were used.

112.    Intel CPUs, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose due to their security defects described above.  Thus, Intel breached its implied warranty of merchantability.

113.    As a direct and proximate result of Intel's breach of its implied warranty of merchantability, Plaintiff and members of the Class have been damaged in an amount to be proven at trial.

114.    Intel cannot disclaim its implied warranties because it knowingly sold or leased a defective product.

115.    Intel knew or should have known of the existence of its CPUs' security defects much earlier.  As described above, Intel knew or should have known had they performed adequate security testing that its CPUs contained these vulnerabilities.  Affording Intel a reasonable opportunity to cure its breach of implied warranties would be unnecessary and futile here because Intel has known of and concealed its defects and, on information and belief, has refused to adequately repair or replace its processors free of charge within or outside of the warranty periods despite the defects' existence at the time of sale or lease of the CPUs, or devices containing the CPUs.

116.    Further, as manufacturers of consumer goods, Intel is precluded from excluding or modifying an implied warranty of merchantability or limiting consumers' remedies for breach of this warranty.

117.    Plaintiff and members of the Class have complied with all obligations under the warranty, or otherwise have been excused from performance of these obligations as a result of Intel's conduct.

118.    As a direct and proximate result of Defendant's breach of implied warranties, Plaintiff and members of the Class have been damaged in an amount to be determined at trial, including, but not limited to, repair and replacement costs, monetary losses associated with reduced processor speeds,

diminished value of their computer devices, and loss of use of or access to their computer devices.

## COUNT V

### Unjust Enrichment/Quasi-Contract

### (On Behalf of the Nationwide Class)

119.   Plaintiff incorporates by reference all allegations as if fully set forth herein.

120.   As described above, Intel designed CPUs with security vulnerabilities that software patches cannot fix without slowing the computers in which the CPUs are embedded.  Intel knew or should have known had they performed adequate security testing that its CPUs contained these vulnerabilities.  Intel failed to notify computer manufacturers that incorporated Intel's CPUs into their products, or consumers who purchased computers with Intel-designed CPUs, that these security vulnerabilities exist.

121.   As a result of its omissions related to its CPUs, Intel obtained monies which rightfully belong to Plaintiff and the proposed Nationwide Class members to the detriment of Plaintiff and the proposed Nationwide Class members.

122.   Intel appreciated, accepted, and retained the non-gratuitous benefits conferred by Plaintiff and the proposed Nationwide Class members, who, without knowledge that the CPUs would not perform as expected and, when repaired, would slow the computers, paid a higher price for the CPUs and computers containing the CPUs.  Intel also received monies for its CPUs and for computers containing its CPUs that Plaintiff and the proposed Nationwide Class members would not have otherwise purchased.

123.   It would be inequitable and unjust for Intel to retain these wrongfully obtained profits.

124.   Intel's retention of these wrongfully obtained profits would violate the fundamental principles of justice, equity, and good conscience.

125.   Plaintiff and the proposed Nationwide Class are entitled to restitution of the profits unjustly obtained, plus interest.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, hereby demands:

1       a)      certification of the proposed Class;

2       b)      appointment of the undersigned counsel as Class counsel;

3       c)      an order enjoining Intel as detailed above, including enjoining Intel from engaging any

4 further in the unlawful conduct set forth herein;

5       d)      a declaration that Intel's actions described above violate consumer laws and unjustly

6 enriched Intel;

7       e)      restitution and disgorgement of all profits wrongfully obtained, except that no monetary

8 relief is presently sought for violations of the Consumers Legal Remedies Act;

9       f)      an award to Plaintiff and the Class of all damages, including actual damages, treble

10 damages, and/or any other form of monetary relief provided by law, except that no monetary relief is

11 presently sought for violations of the Consumers Legal Remedies Act, as well as attorneys' fees and

12 reimbursement of litigation expenses, recoverable under applicable law;

13       h)      such other relief as this Court deems just and equitable.

14 **<u>DEMAND FOR JURY TRIAL</u>**

15 Plaintiff hereby demands a trial by jury on all applicable claims.

17 Respectfully submitted,

18 **GIBBS LAW GROUP LLP**

20 Dated:  January 26, 2018        */s/ Eric H. Gibbs*

Eric H. Gibbs
Andre M. Mura
Amanda M. Karl
Aaron Blumenthal
505 14th Street, Suite 1110
Oakland, CA 94612
Telephone: (510) 350-9700
Facsimile: (510) 350-9701
ehg@classlawgroup.com
amm@classlawgroup.com
amk@classlawgroup.com
ab@classlawgroup.com

Michael S. Danko (SBN 111359)
Kristine K. Meredith (SBN 158243)
**DANKO MEREDITH**
333 Twin Dolphin Drive, Suite 145
Redwood Shores, CA 94065
Telephone: (650) 453-3600
Facsimile: (650) 394-8672
mdanko@dankolaw.com
kmeredith@dankolaw.com

*Attorneys for Plaintiff Sterling*

CLASS ACTION COMPLAINT